<div style="margin">EasternDis'ct *January*,1827

POIGNAND
*vs*
LIVERMORE.</div>

———◦◦———

*THE STATE* vs. *THE BANK OF LOUISIANA.*

APPEAL from the court of the first district.

MARTIN, J. delivered the opinion of the court. The attorney general alleged that the state, in pursuance of the charter of the bank, delivered it her bonds for $2,400,000, in payment of her subscription of $2,000,000 to the stock; or, at the rate of $100 in her bonds for $83 33 1-3 of stock; and in compliance with a provision of the charter the bank sold, on their own account,

<div style="margin">When the record enables the court to act on the merits, their attention may be drawn, without a formal assignment, to any error in the proceedings, after ten days have expired from the filing of the record.
A bank may be sued by one of the stockholders, for his dividend, before the charter has expired.</div>

Eastern Dis't
*January*, 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

The authority of the attorney-general to prosecute or defend any suit in which the state is concerned, results from his office, and is expressly given by statute.

Altho' the charter constitutes the board of directors judges of what dividend they should order, yet, if in the exercise of that or any other power confided to them, they abuse it, courts of justice will control them.

The profits made by the Louisiana Bank, on the sale of the state bonds, are to be divided like any other profits, made by it in ordinary transactions.

The object for establishing a bank with corporate powers, is not merely the division of profits among its members.

these bonds for a profit of $321,822 33, before they went into operation. The subscription of the state of $2,000,000 being, at that time paid in full, while the other stockholders, altogether, had paid but $138,840 on theirs. So that the state was entitled to $300,731 66, as her share of these profits.

That by the charter a sinking fund was constituted for the state, to be administered by her treasurer and the president and cashier of the bank, for the redemption of her bonds; and the said treasurer, president and cashier, were directed by a resolution of the legislature to demand that the portion of the state in the profits so made by the sale of her bonds, should be placed under their direction, to be by them applied to the purposes for which the sinking fund was established; and they were instructed on the refusal of the bank to inform the attorney general, whose duty it was made to take legal measures for enforcing the demand.

The petition concludes with an averment of the demand and refusal, and a prayer for judgment against the bank: and that the mo-

ney be placed under the direction of the administrators of the sinking fund.

The answer admits the subscription of the state, and the delivery of the bonds, as alleged.

It avers the bonds were made payable to to the president, directors and company of the bank, their successors or assigns; and the mode of assignment prescribed by the charter, was the endorsement of the president and cashier. The bank was authorised to contract for the semi annual interest accruing on the bonds, at such place as the president and directors might deem expedient; but it was provided, that any charge or expense, consequent on the payment of such interest any where but at New Orleans, should be defrayed out of the funds of the bank.

It next avers, that the bank entered into a contract, in the city of New York, with Thomas Wilson & Co. of London, for the sale of the bonds, and accordingly assigned them; and by their endorsement the bank bound themselves for the discharge of the principal, and for the payment of the interest, at the exchange of four shillings and sixpence sterling, per dollar, at the counting house of the pur-

EasternDis'et
*January*, 827

THE STATE
*vs*
THE BANK OF
LOUISIANA.

The directors of the Bank of Louisiana, in selling the bonds of the state, had a right to pledge the faith of the institution that the profits arising from the sale should not be divided until payment was made by the state of her bonds to that amount, and the contract is binding on the state.

Eastern Dis'ct
January, 1827

THE STATE
vs.
THE BANK OF
LOUISIANA.

chasers, in London, and at the risk and expense of the bank; paying to the said Thomas Wilson & Co. a commission of one half of one per cent. for receiving and paying such interest.

It is further alleged, that previous to this contract, at a board of directors of the bank, twelve of them being present, it was

"*Resolved*, as the opinion of the board, that no sum of money which may be obtained by the sale of the bonds of the state, belonging to this corporation, above the price of 83 1-3 per cent. and not exceeding one hundred, can justly be divided as profits, except in proportion as the dividends on the stock held by the state in the bank shall have left a surplus, after paying the semi annual interests, to be applied to the payment of the bonds, and the amount of $400,000 shall have been rendered.

"*Resolved*, That the president of the bank be authorised to communicate the foregoing resolution to such persons as may make proposals for the purchase of the bonds, and to pledge the faith of this corporation not to make any dividend contrary thereto."

The answer sets forth, that these resolu-

tions were made known to the purchasers, at whose special request, they were inserted at length in the agreement for the sale of the bonds, and that, at the time of the passage of these resolutions, and that of the sale, the whole number of shares of the capital of the bank, subscribed by other stockholders than the state, was 6942, leaving to be subscribed 13,058 shares; and the adoption of these resolutions was indispensably necessary in order to ensure the sale of the bonds of the state and the subscription of the remaining part of the stock, which was afterwards wholly taken up on the faith of these resolutions, and which, with that previously subscribed for, is bound for the discharge of the bonds of the state, and the payment of the interest, according to the contract.

The answer concludes with an averment, that although a profit may hereafter appear to have been made, yet it is impossible for the directors to say that any has, or if any, to what amount, inasmuch as this will depend on the rate of exchange in London, during a long series of years, and the profits made by the bank on its ordinary operations—that the board has ever made such semi annual divi-

EasternDis't
*January*, 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

EasternDis'ct
January, 1827

THE STATE
vs.
THE BANK OF
LOUISIANA.

dends of the profits of the bank, as to them appeared advisable.

The state had judgment, and the bank appealed.

The documents accompanying the record, are:

1. The sale of the bonds of the state by the bank, to Thomas Wilson & Co. It purports to have been made with reference to the resolutions of the board, stated in the answer.

2. A resolution of the legislature, by which the *directors* of the bank appointed by the state, are required to remonstrate against any further reservation being made of the surplus profits of the bank, greater than prudence may render necessary, and the necessities of the state; and the president and cashier of the bank, appointed by the charter administrators of the sinking fund, are directed to demand from the board that the share of the profits made by the sale of the bonds, to which the state would have been entitled if such profits had been divided among the stockholders, at the time the bank commenced its regular operations, in proportion to their respective amount of stock paid for, be placed under their administration to be applied to

Eastern dis'ct
*January*, 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

the purposes for which the sinking fund was established; and if the demand be not complied with, within thirty days, they are directed to make a report to the attorney general, who is required to take such legal measures to enforce the demand, as he may deem proper.

3. A resolution of the board, setting forth (on the demand) that the surplus funds of the bank are no greater than is necessary for the protection and safety of the bank; nor (after deducting the amount reserved, at the last semi annual dividend, to cover the loss that may probably accrue to the bank from the late failures) than ought to be retained by a provident administration, acting in accordance with strict banking principles, and concluding with the expression of the unanimous opinion of the board; that the directors having already divided such a portion of the profits of the bank as to them seemed advisable, it was considered inexpedient to comply with the demand.

4. A letter from the cashier to the attorney general, in answer to one of the latter, informing him that when the bank went into operation, the amount of cash received was

EasternDis'ct
January,1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

$35,640, and of notes endorsed, $103,200. The capital paid before the first dividend was $2,000,000 by the state, and $395,660 by other stockholders, before the bank went into operation; and between that period and the dividend $132,900, were paid by individual stockholders.

5. The report of the commissioners of the sinking fund, to the attorney general.

6. A general statement of the affairs of the bank, on the 23d of January, 1826.

7. A statement of the monies remitted to Thomas Wilson & Co. for the interest due on the bonds, from November 1, 1824, to July 1, 1825, amounting to $80,000; from the last date to January 1, 1826, $60,000, and like sums to July 1, and to Jan. 1, 1827; in all, $260,000, premium $19,047 66, the commission on four instalments, $1,300; postage, $6 77. These charges amounting to $20,404 53, and the whole to $286,404 53.

8. A statement of the dividends declared; shewing that in July, 1825, a dividend of 2 1-2 per cent. was declared, amounting to $62,185 09, of which the state received $50,000, and other stockholders $12,185 00; and that in January, 1826, a dividend of 3 per cent. was

declared. amounting to $78,529 63 cents, of which $60,000 were received by the state, and $18,529 63 cents, by other stockholders.

Eastern Dis'ct
*January*, 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

No testimony was introduced on the part of the state; that introduced by the bank, shews:

Lamfear deposed, that the articles of agreement for the sale of the bonds were discussed and closed in his presence, and payment was made according to them. The indorsement of the bonds was in the following form, viz. :—" The president, directors and company of the Bank of Louisiana, for value received, do hereby assign the within bond to ————, and bind the capital stock of the said bank, for the payment of the principal sum of said bond, according to the tenor thereof; and do engage to pay the half-yearly interest thereon, at London, at the rate of four shillings and sixpence sterling per dollar, upon the presentation and delivery of the dividend warrant, in the margin thereof; the interest to commence from this day. Witness, the signature of the president and cashier, and the seal of the bank, this first day of November, in the year of our Lord one thousand eight hundred and twenty four. Benjamin Story, president; Joseph Saul, cashier."

Eastern Dis't
January, 18 7

THE STATE
vs.
THE BANK OF
LOUISIANA.

The two resolutions of the bank inserted in the answer, were recited in the contract; and were essential, and indeed, indispensible to the sale of the bonds at the price given for them, ($98\frac{1}{2}$ per cent.) and the deponent considered they could not have been sold, except at a much lower rate, if these resolutions had not been passed. He founds his opinion, in this regard, on the circumstance or belief, that the real and essential security of the purchasers of the bonds, is the bank—and to render that security good, it was necessary that the whole price paid for the bonds should remain in bank; there being at the time of the sale but a small part of the stock subscribed for—and, it being understood, the state had but little disposable property, besides the power of taxation. He does not believe the balance of the stock would have been subscribed, had it been understood that the surplus of the proceeds of the bonds, beyond the sum for which the bank received them, was to be divided among the first stockholders.

Parker deposed: he is a merchant, and has resided for several years in New Orleans. On an average for a number of years past,

the exchange on London, on bills drawn in New Orleans, has been at a premium. In his opinion, the retention of the profits on the sale of the bonds of the state, enhance d the stock of the bank; but he cannot say to what degree.

EasternDis't
*January* 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

Zacharie deposed that, on the opening of the books, he subscribed for a great number of shares on account of several individuals, who had given him orders for 500 shares. He took twenty shares for each of his employers; but this number was reduced to nineteen. He considered the original subscribers as ex-clusively entitled to the profits on the bonds of the state.

Saul deposed: he is cashier to the bank. The surplus retained on the first dividend in July, 1825, was $131,364 85, including dis-counts on bonds discounted, at 12 months; consequently only one half of the amount could be divided, as the dividends are semi-annual. He thinks that, in a bank with a capital like that of the bank of Louisiana, it is proper to retain a surplus of from $250 to $300,000, besides discounts on twelve months' bonds. On the dividend in July, 1825, he thought that 2 per cent. only should have been,

EasternDis'et
*January* 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

instead of 2½ per cent. that were, declared. He has resided a number of years in New Orleans, and has scarcely ever known the exchange on London, at par. Generally the premium varies from 5 to 10 per cent.

On his cross-examination, this witness said the surplus retained in January, 1826, was $512,000, including $320,000, made on the bonds of the state. $300,000 were retained for a permanent surplus fund ; $80,000 from discount of bonds for making up the dividend in July ; and $130,000, in consequence of protested bills and offset.

The points made by the counsel of the bank are, that—

1. This suit was instituted without authority, inasmuch as the resolution of the legislature, relied on by the attorney general, is void; being contrary to the 10th section of the first article of the constitution of the United States.

2. The charter of the bank constitutes the board of directors, the sole judge of the amount of profits to be divided : and this is a part of the contract between the state and the other stockholders, and ought not to be violated.

3. The district judge fell into a great error,

in assuming that $321,822, were made by the bank on the sale of the bonds of the state : whereas, in truth, it cannot be ascertained whether there will be a profit or a loss, until their final payment; and inasmuch as this will depend on the rate of exchange during a period of upwards of 25 years.

Eastern Dis'ct
January, 1827

THE STATE
vs.
THE BANK OF
LOUISIANA.

4. The resolutions of the board, incorporated into the agreement with the purchasers, were essential to the sale of the bonds, and the bank going into operation ; and if any profit result from the sale, it is in consequence of these resolutions. The bank had power to make such a contract with the purchasers, and it cannot be violated.

5. This prosecution, on the part of the state, is highly impolitic.

Before trial, but before the expiration of the ten days allowed for the assignment of errors apparent on the face of the record, (*Code of Practice,* 897.) the counsel for the bank added a new point.

6. The bank is not sueable by the state as a stockholder, except for a settlement of accounts, and the balance appearing due thereon.

The following points were filed by the attorney-general.

THE STATE
vs.
THE BANK OF
LOUISIANA.

7. The object of every subscriber to the capital of a bank, is the instant division of the profits as they are made.

8. The profits made on the sale of the bonds, belong exclusively to the stockholders at the time of the sale, and those who subscribed afterwards cannot legally participate in them.

9. They are not to be divided according to the clause of the charter, directing semi-annual dividends: this clause relating only to the ordinary profits of the bank, viz. :—those made by loans or discounts, and the purchase and sale of bills of exchange. The profits in controversy, presenting a *casus omissus* in the charter.

10. The board acted impro perly and illegally, in retaining a part of the profits.

VI. As the last point made by the counsel of the bank impugns the right of the state to maintain the present suit, it is first to be disposed of.

The attorney-general moved to have it stricken out, because it was filed too late.

On this part of the case, our opinion is with the counsel of the bank. He has not resor ed to this assignment of errors to sustain his appeal: he had a statement of facts to rely on

in the documents and testimony that came up with the record. He is, therefore, at liberty at any time, even without a formal assignment, to draw our attention to any apparent error. It is only when " the appellant does not rely wholly or in part, on a statement of facts, an exception to the judge's opinion, or a special verdict to sustain his appeal : but on an error of law, appearing on the face of the record," that he is " allowed to allege such error, if within *ten days* after the record is brought up, he files, &c." But when the record enables us to act on the merits of the case, our attention may be drawn at any time by either of the parties, to any error of the inferior judge, without having been formally assigned. Indeed, the court would of itself, in many cases, notice the error, even if it escaped the attention of the counsel. Suppose the suit be for the recovery of the wages of iniquity, or to enforce the performance of an illegal or immoral contract, could we affirm a judgment in favour of the plaintiff, because the defendant's counsel mistook, or disregarded his duty ?

The attorney-general cannot complain that the assignment of error was filed too late ; because his adversary was under no obligation

EasternDis't
*January*,1827

THE STATE
*vs*.
THE BANK OF
LOUISIANA.

of filing it at all, and may have the benefit of it without any, but an oral assignment at the hearing.

The bank relies for support in this part of the case, on the principle laid down by this court, in *Faurie & al.* vs. *Millaudon & al.* Vol. 3. 476.

The plaintiffs there, being some of the stockholders of the Planters' bank, called on the defendants, other stockholders who had, or had had, the management of its concerns, for an account of certain transactions, and for damages alleged to have resulted to the plaintiffs, jointly with the other stockholders through the misconduct and fraud of the defendants.   We held the action did not lie, because no partner is sueable by a co-partner, on a particular transaction of the partnership ; but only for a general account, and the balance appearing due thereon.

On this point, however, the opinion of the court is with the attorney-general ; because the charter has provided that the stockholders shall receive semi-annual dividends of the profits of the bank.   The right being semi-annual, the remedy may be resorted to semi-annually—and with regard to any part of the right

that is violated : otherwise it would not be commensurate with the injury. This case differs materially from that invoked by the bank, which was a suit brought by a number of stockholders against the bank. *C. P.* 829, 830 *and* 835. 7 *T. R.* 543. 2 *Maule & Selwyn*, 53. 2 *Kid on Corp.* 109, 113, 122, 270, 302, 306, *& passim.* This opinion is also in conformity with the opinion of this tribunal, in the case of Brand *vs.* the Louisiana State Bank. 8 *Martin*, 310; and that of the Supreme Court of the state of Massachusetts.

I.—The want of authority in the attorney-general, to institute this suit, was not pleaded before the first judge. It is an allegation which should be made *in limine litis.*

In the case of *Hayes* vs. *Curry,* in which the authority of the attorney, who instituted the suit, was questioned, we held that an attorney duly licensed, is a sworn officer; bound by his oath, as well as by the principles of honour and integrity, which ought to characterise the profession of which he is a member, to demean himself correctly in his practice. It is not to be presumed that he acts without proper authority : on the contrary, every proumption is in favour of his having pursued a proper line of conduct. 9 *Martin,* 88.

THE STATE
*vs*
THE BANK OF
LOUISIANA.

The authority of the attorney-general to prosecute or defend any suit, in which the state is concerned, does not, however, result from mere presumption. It is necessarily implied from the nature of his office, and is expressly given by the act of assembly, defining his duties. 1 *Martin's Digest*, 535.

II.—It is true, as contended by the counsel of the bank, that the charter constitutes the board of directors as the sole judge of the amount of profits, which it is, from time to time, advisable to divide ; and, that this is a part of the contract between the state and the stockholders, which ought not to be violated. But it is equally so, as urged by the attorney-general, that in this respect they ought to act discreetly ; and that if in the exercise of the power given them by this part of the charter, or any other, they act capriciously or illegally, the party injured may seek redress in the courts of justice.

Corporations may enact by-laws for the regulation of the means by which the object of their institution may be obtained. But these bye-laws must be reasonable and consistent with the general principles of the law of the land ; and this reasonableness and consistency

is to be tested in a court of justice, when properly brought before it. 2 *Kid on Corp.* 107, 109, 113 and 122. 2 *Maule & Selwyn*, 153. 7 *T. R.* 553. The student may farther attend to what was said by this tribunal, with regard to the right of the party to whom a new trial is refused, to question, on an appeal, the propriety of the exercise of the discretion vested by law in the first judge ; in the case of Sorel *vs.* St. Julien. 4 *Mart.* 168. and with regard to a continuance, in that of Broussart *vs.* Mahar's heirs. *ib.* 489.

III. IV.—The error, which it is complained the first judge fell into, in examining the quantum of the profits made by the sale of the bonds of the state ; and the power of the board in passing two resolutions, inserted in the answer, and in pledging the faith of the corporation for the payment of the principal of these bonds, will be examined, with the merits of the case in the tenth point.

V.—Whether it be impolitic to bring the present suit, is a question which we trust was duly weighed by the law officer of the state, before he instituted it. We are to determine whether the right exists, and have nothing to do with the policy or impolicy of exercising it.

EasternDis'et
*January*, 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

**VI. VII.**—The sixth point has already been disposed of; and the seventh presents nothing but an abstract of the profits, which will be examined with the merits of the case in the tenth.

**VI I.**—It will be time, and the province of those who are to make the division, to inquire whether the profits made by the sale of the bonds of the state, belong exclusively to the stockholders at the time of that sale, when the proper authority in the first or last resort shall have determined that they are divisible.

**IX.**—We cannot assent to the proposition contended for by the attorney-general, that such profits are to be divided at any other time, or in any other manner, than profits made by the bank in its ordinary transactions, on loans, discounts, and the purchase or sale of bills of exchange, or in any other way whatsoever.

The words of the charter are sufficiently ample to cover the profits in controversy. *All* the profits are spoken of without any exception, and *ubi lex non distinguit, nec nos distinguere debemus.* Why should we make a gratuitous exception, to place at our disposal that of which the legislature has pointed out the application?

There is no ambiguity in the words used, *the profits of the bank;* they must necessarily apply to *all* profits of the bank. When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of following its spirit." *C. code 4, art. 13. Knight* vs. *Smith*, 3 *Martin*, 165.

Indeed, were we of opinion, that these profits really arose from a *casus omissus,* in the charter, what other disposition could we decree of them, than that pointed out by the legislature in similar or even analogous cases?—*ubi eadem est ratio, eadem est lex.*—Would we not say these profits ought to be divided by the same persons, at the same time, in the same proportion, and among the same individuals as other profits?—Should the board find it convenient to sell any property of the bank, and do so with a profit, can there be any reason for a distinct partition of what is thus gained?

X. The last point brings us to the merits of the case.

The attorney general says that the object of the contract of partnership is the division of the profits. *Contractus societatis est quo duo, pluresve, inter se pecuniam, res aut*

EasternDis'ct
*January*,1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

*opera conferrunt eo fine, ut quod inde redit lucri, inter singulos, pro rata dividatur.* Watson's Partnership, 1 & 2.

This doctrine is perfectly correct with regard to *private* partnerships. But corporations are constituted for *public* purposes.—They do not answer the object of their institution, when those to whom the administration of their affairs is confided, losing entirely sight of that object, confine their views to making and dividing profits among the corporators.

The legislature contemplated, in the incorporation of the Bank of Louisiana, the creation of a capital of four millions of dollars, which, by enabling the institution to emit and keep afloat notes to a corresponding amount, should afford it the means of relieving the agricultural and mercantile interest of the state from the pressure of almost universal distress.

This relief was the chief and *main object* for which the corporation was erected. The profits, the corporation were to divide from the investment of their funds, were the *inducements* held out; and their efforts to obtain these profits, consequently insure the

EasternDis'ct
January 1827

THE STATE
vs.
THE BANK OF
LOUISIANA.

relief, were the *means* by which the *object* was to be obtained.

The first board of directors, in assuming the trust confided to them, found it imposed a threefold duty:—Towards the state, and their fellow-citizens at large, they were bound to exert their utmost faculties in promoting the object intended for their relief— by securing the early and full subscription of the capital of the bank. Towards the corporation, they were bound to protect this capital, by maintaining it in its integrity, and rendering it profitable. Towards the corporation, they were bound to make such semiannual divisions of the profits, as to them, in the language of the charter, appeared *advisable.*

At a time, when the people labored under the burden of heavy debts, contracted during a period of apparent, but delusive prosperity, a capital of two millions of dollars was to be subscribed for, and bonds of the state to the same amount, were to be brought into market for sale. Subscribers were deterred by the obligation imposed on the bank, to keep branches in the country, the experience of the State Bank shewing

EasternDis'ct
January, 1827

THE STATE
vs.
THE BANK OF
LOUISIANA.

them how burdensome these establishments are—to loan a considerable part of its capital at these branches, on landed security, and to be repaid at deferred annual instalments, and chiefly by the difficulty that it was thought would attend the sale of the bonds of the state, which the charter forbade to be disposed of, at the rate below which the bank had received them.

Louisiana is comparatively as wealthy as any state in the union. But whatever may be the wealth of a state, or potentate, capitalists generally prefer a solvent individual or corporation, to a crowned debtor or independent state; because the latter are incoercible and rarely feel a keen interest in creating or maintaining a reputation for probity and punctuality—the basis of all credit.

Great Britain and France are, perhaps, the wealthiest states in Europe; yet a number of our fellow-citizens have been taught by sad experience, that but little dependence may be placed in the punctuality with which the faith of Great Britain may be expected to be redeemed. It stands pledged since 1815, for the value of their slaves carried away in her fleets; yet their payment seems

EasternDis'ct
*January*, 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

more distant after the lapse of twelve years, than it was supposed to be at the ratification of the treaty of Ghent. They find that the faith of the Bank of England and many a private banker in London, on the score of punctuality, would have been a surer pledge than that of the nation. When the allied sovereigns had succeeded in replacing the Bourbons on the throne of France, they declined to take the monarch, with all the resources of his kingdom, as their debtor, for the expenses they had incurred, unless the faith of a private banking house in London was superadded to the royal engagement.

Had the bonds been sent into market, without the pledge of the faith of the bank, purchasers would have reflected that the certainty of the bonds being paid, at their maturity might be doubted; and that if they were not paid then, the obtaining payment of them would be an object, attended certainly with trouble and delay, probably with expense, and possibly pursued without success. The taxes intended to raise the funds might remain uncollected and perhaps unlaid.

Many individuals have noticed from

E stern Dis'ct
*January* 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

the form of these bnods, inserted in the charter, that it was not expected by the state, that the bank should pledge itself for the payment of the principal.

These bonds are payable to the president, directors and company of the Bank of Louisiana, their successors *or assigns*, not *to their order*; and the bank are authorised to *sell* them for their amount, that is, to transfer for a valuable consideration, their right to the state.

He, who sells a debt, warrants its existence at the time of the sale, but not the solvency of the debtor. *C. code*, 368, *art.* 125 *and* 126. The obligation to guarantee the payment of the principal of these bonds was neither of the essence nor of the nature of the contract by which they were sold, though it might be and was the result of an adventitious clause inserted in the contract.

The dubious success of the institution appearing to depend on the sale, to enforce and effect it, if possible, with a profit, was the object of the constant attention of the board. No better means presented themselves to them, to compass this *desideratum* than to

superadd the pledge of the faith of the bank
to that of the state, and with a view of in-
creasing the security of the purchasers by
adding to that of their incidental debtors,
they promised to retain, out of the profits
made by the state, a sum not exceeding
$400,000, until the payment of the bonds
of the state to that amount. So that while
the corporation underwent a responsibility
for $2,100,000, it might be able to present
to its new creditors a corresponding pledge
in its hands, viz.—$2,000,000 in the bank
stock of the state, and as much of the pro-
fits of the sale, as would amount to $400,-
000.

The directors of the bank being charged
with the administration of its affairs, may
certainly pledge its faith in the execution of
their trust. Indeed, in most cases, it is im-
pliedly so, as it was in the present for the ex-
istence of the debt sold. If, in order to ef-
fect the sale and to enforce a profit, it be-
came advantageous to the bank that its faith
should be pledged expressly for the payment
of the bonds of the state, it is not easy for us
to see on what ground it may be contend-
ed that while the directors sold a debt due

THE STATE
vs.
THE BANK OF
LOUISIANA.

to the bank, and received its value, they should not accede to the stipulation of the vendee, that the price paid should be restored to him, if he could not obtain payment from the debtor of the bank.

The charter gives the power, and interest makes it the duty of the board, to retain such parts of the profits of the bank as they think advisable. If, therefore, the board thought it advisable, in order to effect a sale and an advantageous one, that the profits made thereon, or a part of them, should not be divided till a certain contingency happened, they acted legally and discreetly in making the promise: unless it be contended that a board of directors cannot derogate from the powers of a subsequent one, and that every board has semi annually the power of determining what part of the profits of the bank it is advisable to demand; unfettered, nay, unembarrassed by the opinion of any preceding board. This question may be discussed and determined by any future board declaring a dividend. Admitting that it may properly be determined in the affirmative, nothing can prevent a subsequent board from considering the resolution

EasternDis't
*January,* 1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

of the first, as discreet and advantageous to the bank, and as such to be carried into effect, notwithstanding their want of obligation. We are to conclude, as the directors who made the first and second dividend did not divide the profits in controversy, they did not deem it advisable to do so.

Another consideration appears to have justi ed the conduct of the board in a considerable degree. The place of payment of the interest arising on the bonds, was to be fixed by the bank. Payment in London (the market in which the bonds were expected finally to find the readiest sale,) was offered, a circumstance, which, while it presented a great inducement to purchasers, and insured a high price, was attended with a corresponding burden on the bank, and detracted from its profits.

It is in evidence, the bank became bound to pay a commission of one half of one per cent. for receiving and paying the semi annual interest in London; and that funds are not conveyed thither from New Orleans, without a loss—that bills of exchange, which offer the cheapest mode of remittance, are generally bought at a premium of from five

to ten per cent. Taking 7 1-2 per cent the medium for the average price, and adding the commission paid in London, we have 8 per cent Two per cent. will be absorbed, by a commission on brokerage here on the purchase of the bills, and a proper allowance for the risk incurred by endorsement. This makes the loss 10 per cent.

The interest on $2,400,000 at 5 per cent. is $120,000, and the loss on this at 10 per cent. is $12,000; which, repeated yearly, during ten years, to the maturity of the first bonds, is $120.000.

On the bonds payable in fifteen years, the annual loss is reduced by one fourth, by the payment of the first bonds: $9,000 a year for five years, $45,000.

On the bonds at twenty years, the yearly loss is $6,000, and for five years, $30 000.

On the last bonds, payable in twenty-five years, the annual loss is 3,000: for five years, $15,000.

The aggregate loss is $210,000. It diminishes the profits of the sale; not, indeed, by that nominal sum, which is to be paid by several and defined instalments, whilst the profits are received at once.

Eastern Dis't *January*, 1827

THE STATE *vs.* THE BANK OF LOUISIANA.

The attorney-general urges that, by the clause in the charter, authorising the bank to fix the place of payment of the interest accruing on the bonds, it was provided, that the charges and risks attending such payment, elsewhere than in New Orleans, should be borne by the bank. Hence, he concludes that the bank has no right to withhold from the state, any part of its share in the profits made by the sale, to meet the remote chances of loss on exchange, commission in London, or failures. He views the exemption of the state from any defalcation on this account, as a *bonus* stipulated for in the charter.

Had an actual *bonus* been stipulated for in money, the payment of it must have reduced *pro tanto*, the profits of the bank; and, consequently, the share of the state in the profits.

In declaring a dividend, the preservation of the capital of the bank in its integrity is never to be lost sight of, and the profits left after the payment of the *bonus*, if any be stipulated for, are alone divisible. In other words, when the state is a stockholder, it must as such, bear a part of the *bonus*, payable in money, or resulting from an exemption of charges.

EasternDis'ct
*January*,1827

THE STATE
*vs.*
THE BANK OF
LOUISIANA.

After a close examination of the evidence, and much attention to the arguments of counsel, the impression left on our minds is that the bonds of the state were estimated at a fair value in the charter; and that if they have been sold above this value, it is owing to the pledge of the faith of the bank, and the assurance given that the profits made on the sale to the amount of $400,000, should not be divided until one-sixth part of the bonds should be discharged, and leave the $2,000,000, the stock of the state in the bank, equal to the amount of the bonds remaining unpaid.

We conclude, that the passing of the resolutions of the board, recited in the agreement for the sale of the bonds, was the discreet exercise of legitimate authority, and that the engagement taken in pursuance of these resolutions, by the agent of the bank in the sale of bonds, ought not to be violated.

It is therefore ordered, adjudged and decreed, that the judgment of the district court be annulled, avoided and reversed; and proceeding to render such a judgment as, in our opinion, ought to have been given in the district court; it is ordered that the defendants be dismissed.

The Attorney-general (*Preston*,) for the state, *Livermore* for the bank.